Emily von Jentzen
KAUFMAN VIDAL HILEMAN ELLINGSON PC
22 Second Ave. West, Suite 4000
Kalispell, MT 59901
Telephone: (406) 755-5700
Fax: (406) 755-5783
emily@kvhlaw.com

Attorney for Plaintiff

FILED
11/18/2024
Clerk, U.S. District Court
District of Montana
Billings Division

# UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA
## BILLINGS DIVISION

| | |
|---|---|
| MELISSA BRENNAN, <br><br>                           Plaintiff, <br><br> vs. <br><br> MONTANA UNIVERSITY SYSTEM, MONTANA STATE UNIVERSITY-BILLINGS POLICE DEPARTMENT, and JOHN DOE DEFENDANTS 1-50, <br><br>                           Defendants. | Civil Action No. CV-24-167-BLG-TJC <br><br><br> **COMPLAINT AND DEMAND FOR JURY TRIAL** |

This action is brought pursuant to Title VII of the Civil Rights Act and Title IX of the Education Amendments of 1972, for reinstatement of Plaintiff's position and monetary damages to redress Defendants' acts of unlawful retaliation against Plaintiff for complaining of Defendants' acts of sex discrimination by the Montana State University-Billings Police Department; and pursuant to the Montana Human Rights Act, Mont. Code Ann. § 49-2-303 *et seq.,* for monetary damages to redress

Defendant's acts of unlawful sex discrimination and retaliation; and the Montana Wrongful Discharge from Employment Act, Mont. Code Ann. § 39-2-903 for monetary damages that resulted from Defendants' constructive discharge of Plaintiff's employment.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over Plaintiff's federal civil rights claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4).

2. On February 22, 2024, Plaintiff concurrently filed a Complaint with the Montana Human Rights Bureau and the Equal Employment Opportunity Commission alleging that her employer, the Montana State University-Billings Police Department, discriminated against and retaliated against her because of her sex in violation of the Montana Human Rights Act (MHRA), the Montana Governmental Code of Fair Practices (GCFP) and Title VII of the Civil Rights act of 1964 (Title VII).

3. On August 20, 2024, the Montana Human Rights Bureau issued a Notice of Dismissal and Notice of Right to File Action in District Court.

4. On October 22, 2024, the Equal Employment Opportunity Commission issued a Dismissal and Notice of Rights regarding claims of unlawful discrimination under Title VII of the Civil Rights Act of 1964.

5. Plaintiff has exhausted her administrative remedies for her claims under the Montana Human Rights Act.

6. Jurisdiction over Plaintiff's claims under the Montana Human Rights Act is proper pursuant to 28 U.S.C. § 1367(a), because these claims are so related to those of Plaintiff's claims within the original jurisdiction of this Court that they form part of the same case or controversy under Article III of the United States Constitution.

7. Jurisdiction over Plaintiff's Title VII claims is proper pursuant to 42 U.S.C. § 2000e-5(f).

8. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2). The events giving rise to this claim occurred in this District.

**PARTIES**

9. Plaintiff Melissa Brennan (hereinafter referred to as "Brennan") is an adult citizen of the state of Montana, who at all times relevant to the facts of this Complaint was a resident of Yellowstone County. Brennan was employed by Montana State University-Billings Police Department (hereinafter referred to as "MSU-B Police Department") in Yellowstone County from January 4, 2021 through February 22, 2024.

10. Brennan began work on January 4, 2021, as a Patrol Officer and was promoted to Sergeant on December 14, 2022. She was placed on administrative leave on January 13, 2024, and remained on administrative leave until her resignation on February 22, 2024. At the time Brennan's employment ended,

her direct supervisor was Assistant Chief Charles Smith (hereinafter referred to as "Assistant Chief Smith") and the head of the Police Department was Chief Brandon Gatlin (hereinafter referred to as "Chief Gatlin").

11. Defendant Montana State University-Billings is part of the Montana University System, which is an educational program that receives Federal financial assistance and operates a campus in Billings that includes the Police Department where Brennan was employed.

## ALLEGATIONS COMMON TO ALL COUNTS

12. Brennan began working for MSU-B Police Department as a Patrol Officer on January 4, 2021. On December 14, 2022, Brennan was promoted to Sergeant. Brennan was the first female Sergeant in history at MSU-B Police Department. At the time of her employment and up to the point her employment was terminated, Brennan was the only female law enforcement officer of any rank at MSU-B Police Department.

13. During her employment with MSU-B Police Department, Brennan was treated disparately compared to male sergeants and patrol officers. Disparate treatment included inconsistent discipline imposed based upon gender, restricted access to necessary systems based on gender and different job expectations for the Sergeant position based upon gender.

14. On February 3, 2023, MSU-B Police Department Chief Gatlin sent out an email directing officers to assist with parking enforcement during shifts. Between March 20-24, 2023, MSU-B Police Department Chief Gatlin and Assistant Chief Smith spoke with Brennan about tickets. Chief Gatlin stated "Admin told me that we needed to make money for parking," and "I need the Officers to write more parking tickets to make money for parking," "if they don't, I will have to start writing them up." Assistant Chief Smith stated to Brennan, "Murphy didn't want to do them, so we handed him the T2 and made him go write tickets."

15. Brennan raised concerns with MSU-B Police Department Chief Gatlin and Assistant Chief Smith about her concerns that a mandate to officers to write more tickets may be an illegal quota.

16. Mont. Code Ann. § 46-6-420 prohibits arrest, citation, or stop quotas by any state or local government agency employing a peace officer. "Quota" means a specific number of arrests, citations, or investigative stops. Mont. Code Ann. § 7-32-103(3) provides that quotas for citations may not be established and may not be used in evaluating officers.

17. On October 1, 2023, Chief Gatlin sent Brennan an email that alleged Brennan was advising other officers not to write parking tickets, that Brennan had not brought any concerns about the legality of the parking enforcement directive

to her superiors and set a meeting to discuss possible insubordination for October 11, 2023.

18. During the meeting on October 11, 2023, Chief Gatlin admitted that no one had said Brennan instructed them not to write tickets (which is contrary to what Chief Gaitlin communicated in his October 1, 2023 email). During the meeting, the legality of officers being ordered to write tickets to generate funds was discussed. Chief Gatlin admitted during this conversation that he was instructing Brennan to order the officers to write tickets to generate funds for parking. Brennan's job performance was not discussed nor any other alleged issues were discussed.

19. Brennan had a meeting with Human Resources on October 25, 2023, at which time Brennan raised concerns about being treated differently from male co-workers while in the Sergeant position. Human Resources then purportedly brought in Frank Parrish to investigate the claims made by Brennan, however, instead of investigating Brennan's complaint of disparate treatment, the investigation was focused on identifying wrongdoing on the part of Brennan. Immediately after this first investigation was "concluded" Frank Parrish initiated a second investigation into Brennan.

20. Brennan raised concerns with the Union (Federation of Classified University Staff Local #8521) regarding the directive she had received to "write more

tickets," which she believed to be illegal. Brennan also reported concerns to the Union about discriminatory conduct. The Union took no action to address Brennan's concerns. The Union should have mediated the issue and did not.

21. Following the results of Frank Parrish's investigation, on January 13, 2023, Brennan was placed on paid administrative leave based on the justification that she allegedly "was not issuing enough parking tickets." However, male patrol officers were not placed on administrative leave or disciplined for that offense.

22. During the last week of her employment, Union representatives called Brennan three days in a row and advised that she was going to be terminated and that if she wanted to avoid her POST being revoked, she needed to resign her position. Following the pressure placed upon her by the Union representatives, Brennan elected to resign her position on February 22, 2024.

## COUNT 1
### (Retaliation for Brennan's Protected Activity Under Title IX of the Education Amendments of 1972)

23. Plaintiff realleges paragraphs 1-22 as if fully set forth herein.

24. Brennan was subject to inconsistent and discriminatory discipline by Defendant MSU-B Police Department:

   a. Brennan was subject to severe scrutiny and two internal investigations due to a purported failure to issue enough parking tickets and alleged

insubordination. No male officer or sergeant's issuance of parking tickets was scrutinized to the level Brennan was scrutinized. No male officer or Sergeant was ever subject to employee discipline or termination on the basis of a purported failure to issue enough parking tickets.

b. Male officers who were investigated in the past for far more egregious offenses than failure to issue enough parking tickets received less severe discipline, including but not limited to:

   i. A male officer subject to internal investigation for having sex with students while on duty was under investigation for a shorter period of time than Brennan, was placed upon a shorter leave and was not terminated.

   ii. A male officer subject to internal investigation for having sex while on duty with an employee of a gas station, was under investigation for a shorter period of time than Brennan, was not placed on leave and was not terminated.

   iii. A male officer exhibiting insubordinate behaviors (including yelling at Assistant Chief Smith and disobeying a direct order that he was not permitted to take the patrol vehicle into the shop) was not written up, subject to investigation or terminated.

    c. Male Sergeants were provided access to systems and training that Brennan was denied including but not limited to:

        i. Brennan was left out of communications about potential new hires, when males in the Sergeant position were consulted on new hires. Assistant Chief Smith told Brennan he was "not allowed" to discuss potential new hires with her. However, Chief Gatlin and Assistant Chief Smith did discuss potential new hires with a lower ranking male patrol officer.

        ii. Brennan requested training on the ARMS system (which Assistant Chief Smith was trained in when he was in the Sergeant position). Assistant Chief Smith told her it was "too complicated" for her to "understand."

        iii. When Brennan asked for training on scheduling, Assistant Chief Smith told her there was no formal training and that he assumed she was "competent enough to figure it out." As Brennan was trying to "figure it out" she made errors on the schedule when the Department switched from five officers to six. Brennan asked for training from Chief Gatlin and she stated that Assistant Chief Smith had "too much on his plate to give training." Assistant

       Chief Smith refused to give Brennan training on scheduling and instead sent Brennan the schedule every month.

  iv.  Assistant Chief Smith and Paula Highlander had a closed-door meeting with Brennan. They presented Brennan with an "Expectation Plan" concerning the schedule. At the end of the list, it stated that if Brennan had any errors on the schedule, she could be written up or terminated. Assistant Chief Smith was asked if he would be placed on one as well. Assistant Chief Smith laughed and said "no." Brennan informed Paula Highlander that the month before, Assistant Chief Smith had made a mistake on the schedule and caused Brennan to be the only one on duty when there were games that needed to be worked, as well as officers to respond to calls. Brennan asked Paula Highlander if Smith would be placed on an expectation plan as well. Highlander stated that she was new and didn't know if he had ever had one. Brennan asked Smith if he had, he said "no." Brennan told Paula Highlander that this was sexual discrimination as sergeants before her had made errors on scheduling and were not disciplined in the way that she was being disciplined. Paula Highlander stated that this was not disciplinary but also stated

   that because she had made a mistake on the schedule, it needed to be addressed.

  v. Assistant Chief Smith made an error on the schedule last month (March of 2024) where he left off overtime from the schedule. Assistant Chief Smith was not placed on an expectation plan after this incident.

25. Brennan was subject to unlawful retaliation after she reported sex based discrimination and retaliation:

 a. The email directive from Chief Gatlin was sent out February 3, 2023 directing officers to focus more on parking enforcement during their shifts.

 b. March 20-24, 2023: Chief Gatlin and Assistant Chief Smith spoke to Brennan about tickets. Chief Gatlin stated "Admin told me that we needed to make money for parking," and "I need the Officers to write more parking tickets to make money for parking," "if they don't, I will have to start writing them up." Assistant Chief Smith stated "Murphy didn't want to do them, so we handed him the T2 and made him go write tickets."

 c. Week of April 17th, 2023: Brennan had a verbal conversation with Assistant Chief Smith discussing quota law and Brennan told him that

       she believed it was illegal to instruct the Officers to write more tickets. Assistant Chief Smith said he "didn't know" if it was or not.

d. May 8, 2023: One on one meeting between Brennan and Assistant Chief Smith. Brennan reported back what she had learned about quota law in her research. Assistant Chief Smith brought Chief Gatlin into the meeting. Chief Gatlin stated "I have to be able to tell the officers what to do." Chief Gatlin dismissed Brennan's concerns, but neither gave her any directive against asking questions of other agencies.

e. May 10, 2023: Brennan again spoke with Chief Gatlin about her ticket quota concerns and was again dismissed.

f. September 9, 2023: Brennan again spoke with Chief Gatlin about her concerns with ticket quotas and was again dismissed.

g. As a direct result of some of Brennan's conversations with Assistant Chief Smith regarding her concern about directing officers to "write more tickets," a "self-initiated contacts" section was added to the CAD system as an alternative to a directive for writing more tickets. The idea of "self-initiated contacts" came from Chief Langve of the Laurel Police Department.

h. On October 11, 2023, Chief Gatlin sent Brennan an email that alleged Brennan to be advising other officers they were "not responsible for

writing tickets" and that such statements were in direct opposition to Chief Gatlin's February 3, 2023 directive to "prioritize parking enforcement." Chief Gatlin claimed in his email that Brennan had not sought clarification from either Chief Gatlin or Assistant Chief Smith if Brennan had "thought the directive was unlawful or not supported by policy." Chief Gatlin then advised her conduct "may be insubordinate" and he requested a meeting with Brennan on October 11, 2023.

i. During the meeting on October 11, 2023, Chief Gatlin admitted that no one had said Brennan instructed them not to write tickets (which is contrary to what Chief Gaitlin communicated in his October 1, 2023 email). During the meeting, the legality of officers being ordered to write tickets to generate funds was discussed. Chief Gatlin admitted during this conversation that he was instructing Brennan to order the officers to write tickets to generate funds for parking. Brennan's job performance was not discussed nor any other alleged issues were discussed.

j. In addition to these communications, Brennan took additional efforts to investigate her concerns by reaching out to other individuals including Tammy Harris, field consultant, and Joel Wendland. While discrimination and retaliation were not discussed during the October

    11, 2023 meeting, Brennan raised those concerns at a later meeting on October 25, 2023. Individuals present at the meeting included Paula Highlander, Tammy Harris, and Dennis Bowman. This is the meeting that Brennan requested to discuss issues with the department, including the sexual discrimination and retaliation she felt she had been subjected to. Paula Highlander and Dennis Bowman both typed notes during the meeting. Brennan gave Paula Highlander documentation supporting the sexual discrimination and retaliation claims she raised.

k. In the meeting on October 25, 2023, Paula Highlander stated she would recruit a third party to investigate the sexual discrimination and retaliation claims. Brennan requested that Highlander recruit an entity outside of the University to secure a neutral party investigator. Brennan requested that she not hire Bozeman University Police to investigate due to previous investigations being improperly investigated. Brennan asked that Highlander use the Department of Criminal Investigation, a state agency that was used to investigate other state agencies. Highlander ignored Brennan's request and hired the former Chief of the Bozeman University Police Department to investigate MSU-B Police Department.

26. During the meeting on October 25th with Paula Highlander and Assistant Chief Smith, Brennan stated she believed she was being treated differently than male sergeants had been treated. Assistant Chief Smith stated, "We are not doing that." Brennan asked, "Doing what," and Assistant Chief Smith stated, "Making this a male-female thing."

27. Assistant Chief Smith has been investigated for sexual discrimination in the past. The night watch for Petro Hall, Jennie, stated on one occasion Smith had thrown a Montana driver's license at her and stated, "That is why women should not have positions of power."

28. These acts of continuing discrimination were taken against Brennan in retaliation for her having raised concerns regarding MSU-B Police Department's violations of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.

29. As a direct and proximate result of MSU-B Police Department's illegal actions, Brennan has suffered direct and consequential damages, including but not limited to, lost pay and lost benefits, emotional and mental anguish, humiliation and embarrassment, ridicule, damage to her professional reputation and career, and damage to her reputation in the community, justifying awards of damages in amounts to be determined at trial.

**COUNT 2**
**(Sex Discrimination in Violation of the Montana Human Rights Act)**

30. Plaintiff realleges paragraphs 1-29 as if fully set forth herein.

31. These acts of continuing discrimination were taken against Brennan on the basis of her sex in violation of the Montana Human Rights Act.

32. As a direct and proximate result of Defendant MSU-B Police Department's violations of the Montana Human Rights Act, Brennan has suffered direct and consequential damages, including but not limited to, lost pay and lost benefits, emotional and mental anguish, humiliation and embarrassment, ridicule, damage to her professional reputation and career, and damage to her reputation in the community, justifying awards of damages in amounts to be determined at trial.

## COUNT 3
**(Sex Discrimination and Retaliation in Violation of Title VII of the Civil Rights Act of 1964)**

33. Plaintiff realleges paragraphs 1-32 as if fully set forth herein.

34. Defendants' actions, set forth above, constitute illegal discrimination on the basis of her sex and in retaliation for her complaints and constitute unlawful employment practices under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1).

35. As a direct and proximate result of Defendant MSU-B Police Department's violations of Title VII, Brennan has suffered direct and consequential damages, including, but not limited to, lost pay and benefits, emotional and

mental anguish, humiliation and embarrassment, ridicule, damage to her professional reputation and career, and damage to her reputation in the community. This justifies awards of damages in amounts to be determined at trial.

## COUNT 4
**(Violation of the Montana Wrongful Discharge from Employment Act)**

36. Plaintiff realleges paragraphs 1-35 as if fully set forth herein.

37. Plaintiff was employed by MSU-B Police Department for over three years and was not within a probationary period at the time of her resignation.

38. Plaintiff was constructively discharged from her employment due to the actions of Defendant MSU-B Police Department and its agents.

39. Pursuant to Mont. Code Ann. § 39-2-903, wrongful termination includes constructive discharge.

40. Defendant MSU-B Police Department created a situation by which an objective, reasonable person would find so intolerable that resignation was Plaintiff's only reasonable alternative.

41. Plaintiff was not discharged for good cause.

42. Pursuant to Mont. Code Ann. §§ 39-2-903(1),(2), 904, Plaintiff was subjected to wrongful discharge by Defendant MSU-B Police Department and its agents.

43. As a direct and proximate result of MSU-B Police Department's violations of the Montana Wrongful Termination of Employment Act, Brennan has suffered direct and consequential damages, including but not limited to, lost pay and lost benefits, justifying awards of damages in amounts to be determined at trial.

## DEMAND FOR JURY TRIAL

44. Plaintiff hereby demands that this matter be tried before a jury.

## RELIEF REQUESTED

WHEREFORE, Plaintiff respectfully requests the following relief:

1. An Order reinstating Brennan to her former position as Sergeant of MSU-B-Police Department, or a comparable position;

2. An award of all attorneys' fees and costs, including an award of fees and costs pursuant to 42 U.S.C. § 2000e-5(k);

3. An award for compensatory damages, and all other appropriate relief pursuant to Plaintiff's claims under the Montana Human Rights Act, Mont. Code Ann. § 49-2-303 *et seq.*

4. An Order declaring Defendants' conduct towards Brennan a violation of the Montana Human Rights Act;

5. An award of Brennan's damages for Defendants' violations of her rights under the Montana Human Rights Act, including, but not limited to, lost pay, back pay, front pay and lost benefits;

6. An award of compensatory damages, the exact amount to be determined at trial for Brennan's claims under the Montana Human Rights Act;

7. An award for costs and fees of the action concerning Brennan's claims under the Montana Human Rights Act, including those incurred at the administrative level, as well as reasonable attorneys and expert witness fees, and prejudgment and post-judgment interest;

8. An award of monetary damages arising from Defendants' violation of Title IX of the Education Amendments of 1972, including, but not limited to, lost pay, back pay and lost benefits;

9. An award of compensatory damages arising from Defendants' violation of Title IX of the Education Amendments of 1972, including but not limited to, an award for damages for lost pay, lost benefits, humiliation, embarrassment, emotional distress, physical pain, and damage to professional reputation and career, in an amount to be determined at trial;

10. An award of compensatory damages arising from Defendants' violation of the Montana Wrongful Termination of Employment Act pursuant to Mont. Code Ann. § 39-2-905, including lost wages and fringe benefits for a

period not to exceed 4 years from the date of discharge together with interest on the lost wages and fringe benefits.

11. For money damages sustained as a result of wrongful termination;

12. For any other such relief as this Court deems just and proper.

RESPECTFULLY SUBMITTED this 18th day of November, 2024.

                KAUFMAN VIDAL HILEMAN ELLINGSON PC

By: /S/ Emily von Jentzen
      Emily von Jentzen
      Attorney for Plaintiff